NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

TABITHA S., JEFFERY S., C.S., D.S., M.S., A.S., *Appellants*,

*v.*

DEPARTMENT OF CHILD SAFETY, X.S., B.S., *Appellees*.

No. 1 CA-JV 17-0265
FILED 1-11-2018

Appeal from the Superior Court in Maricopa County
No. JS18709
The Honorable Joseph C. Welty, Judge

**AFFIRMED**

COUNSEL

David W. Bell Attorney at Law, Mesa
By David W. Bell
*Counsel for Appellant Tabitha S.*

Czop Law Firm, PLLC, Higley
By Steven Czop
*Counsel for Appellant Jeffery S.*

Denise L. Carroll, Esq., Scottsdale
By Denise L. Carroll
*Counsel for Appellants C.S., D.S., M.S., and A.S.*

Arizona Attorney General's Office, Phoenix
By Amber E. Pershon
*Counsel for Appellee DCS*

---

**MEMORANDUM DECISION**

Judge Diane M. Johnsen delivered the decision of the Court, in which Presiding Judge Lawrence F. Winthrop and Judge Maria Elena Cruz joined.

---

J O H N S E N, Judge:

¶1    The superior court found six children of Tabitha S. ("Mother") and Jeffery S. ("Father") (collectively "Parents") dependent and then severed Parents' rights as to the children.  Parents and some of the children appeal; we affirm.

**FACTS AND PROCEDURAL BACKGROUND**

¶2    Minnesota Child Protective Services became involved with the family in 2011 and provided supervision and services until early 2014.[1] The family moved to Arizona in spring 2014.  The Department of Child Safety ("DCS") became involved in August 2014 after one of Mother's children, K.S., died under suspicious circumstances in the care of a babysitter that Parents knew only as "Rico."

¶3    Mother had met Rico in March or April 2014 and engaged in a sexual relationship with him.  Although Parents did not perform a background check of Rico and claim they did not know there was a warrant out for his arrest for domestic violence, they allowed Rico to move in with them in May 2014 and allowed him to care for the children while Parents went to work.

¶4    After K.S.'s death, the Avondale Police Department and DCS found the family's home was dirty with trash throughout and smelled of feces and urine; there were locks on the pantry and refrigerator; and all of

---

[1]    This court views the evidence in the light most favorable to sustaining the superior court's findings. *See Manuel M. v. Ariz. Dep't of Econ. Sec*'y, 218 Ariz. 205, 207, ¶ 2 (App. 2008).  Parents consented to the termination of their parental rights to a seventh child in April 2016.  That child is not a party to this appeal.

the smoke detectors were disabled. The police found marijuana and beer bottles in the home and noticed the locks on the children's bedroom doors were turned around so they could be unlocked only from outside.

**¶5**      The children reported that Parents locked up the food in the home, and said that as a result, they sometimes grew so hungry that several of them ate dog food. The children further reported they would urinate or defecate on their bedding because Parents or Rico would lock their bedroom doors, preventing them from using the bathroom. The children reported Parents hit them and made two of the boys fight each other. Further, the children also gave accounts of domestic violence they witnessed between Parents. One child reported drinking beer with Father and that Father pulled out one of his teeth using pliers. The children also reported that Rico hit them and attempted to suffocate two of them. The children also stated Rico bit them and that Parents knew he did.

**¶6**      K.S. died from injuries suffered after Parents left the children at home with Rico. According to the medical examiner's report, the cause of K.S.'s death was "blunt trauma of torso with left renal laceration," and a contributing condition was "blunt trauma of head." The medical examiner did not determine the manner of the child's death. However, a Child Protective Team member, who is a medical doctor, reviewed the hospital records and the medical examiner's report and testified she believed K.S. died from an inflicted injury, which is consistent with the medical examiner's opinion that the injuries were "most likely inflicted by another person(s)" and that the findings were "highly suspicious for non-accidental trauma."

**¶7**      DCS took the children into temporary custody immediately following K.S.'s death in August 2014 and filed a petition alleging the children were dependent as to Parents due to abuse and neglect. DCS offered reunification services, but Father refused to submit to a psychological evaluation because of the ongoing investigation into K.S.'s death. Parents denied the allegations and the following month, DCS moved to suspend visitation with Parents based on the recommendation of a psychologist.

**¶8**      Eventually, in March 2016, Mother filed a motion to appoint Father's parents as the children's permanent guardians, and in April 2016, the superior court awarded the grandparents guardianship, contingent on their agreement to a safety plan that provided that (1) Parents were to move out of the grandparents' house and (2) the grandparents were to supervise any contact between the children and Parents.

¶9            Despite the safety plan, the grandparents, Parents and the children all moved to Nevada in May 2016 in an apparent attempt to circumvent the terms of the guardianship. Less than a month after arriving in Nevada, the grandparents moved to Minnesota, leaving the children with Parents in Nevada.

¶10          DCS filed an emergency motion for the pickup of the children in August 2016 and reactivated the dependency petition, alleging Parents had failed to protect the children and the grandparents had left the children in the unsupervised care of Parents. Parents denied the allegations and in November 2016, DCS filed a petition for termination of Parents' parental rights on grounds of abuse, neglect and termination within the preceding two years.

¶11          The superior court held a seven-day combined dependency, termination and guardianship revocation hearing in February and March 2017. After taking the matters under advisement, the superior court issued detailed orders finding the children dependent, terminating Parents' rights and revoking the grandparents' permanent guardianship.[2]

¶12          Parents and some of the children filed timely appeals. We have jurisdiction pursuant to Article 6, Section 9 of the Arizona Constitution and Arizona Revised Statutes ("A.R.S.") section 8-235(A) (2018).[3]

## DISCUSSION

### A.    Dependency.

¶13          Parents appeal the superior court's order adjudicating the children dependent, arguing DCS failed to prove a sufficient factual basis and the court failed to consider the circumstances existing at the time of the dependency adjudication. Given the intervening severance order, however, the dependency order is moot. *See Rita J. v. Ariz. Dep't of Econ. Sec.*, 196 Ariz. 512, 515, ¶ 10 (App. 2000).

---

[2]         The order revoking the guardianship is not at issue in this appeal.

[3]         Absent material revision after the relevant date, we cite a statute's current version.

**B.      Abuse and Neglect as Grounds for Severance.**

**¶14**          Parents argue insufficient evidence supports the superior court's order terminating their parental rights on the ground of abuse or neglect under A.R.S. § 8-533(B)(2) (2018).

**¶15**          "Parents possess a fundamental liberty interest in the care, custody, and management of their children." *Kent K. v. Bobby M.*, 210 Ariz. 279, 284, ¶ 24 (2005).  A court may sever those rights if it finds clear and convincing evidence of one of the statutory grounds for severance and finds by a preponderance of the evidence that severance is in the child's best interests.  A.R.S. §§ 8-533(B), 8-537(B) (2018); *Kent K.* at 281-82, 288, ¶¶ 7, 41.

**¶16**          We review the superior court's severance order for an abuse of discretion.  *Jade K. v. Loraine K.*, 240 Ariz. 414, 416, ¶ 6 (App. 2016).  As the trier of fact in a termination proceeding, the superior court is in the best position to weigh the evidence, judge the credibility of witnesses, observe the parties and resolve disputed facts.  Accordingly, this court views the evidence and reasonable inferences drawn from the evidence in the light most favorable to sustaining the superior court's decision.  *Jordan C. v. Ariz. Dep't of Econ. Sec.*, 223 Ariz. 86, 93, ¶ 18 (App. 2009).  We will not reweigh the evidence and will not reverse unless no reasonable evidence supports the court's factual findings.  *Id.*

**¶17**          To justify termination of parental rights under A.R.S. § 8-533(B)(2), DCS must prove a parent has neglected or willfully abused a child.  "[A]buse includes serious physical or emotional injury or situations in which the parent knew or reasonably should have known that a person was abusing or neglecting a child."  A.R.S. § 8-533(B)(2).  "[P]arents who abuse or neglect their children, or who permit another person to abuse or neglect their children, can have their parental rights to their other children terminated even though there is no evidence that the other children were abused or neglected." *Tina T. v. Dep't of Child Safety*, 236 Ariz. 295, 299, ¶ 17 (App. 2014) (quoting *Linda V. v. Ariz. Dep't of Econ. Sec.*, 211 Ariz. 76, 79, ¶ 14 (App. 2005)).  In such a case, "DCS must show a constitutional nexus between the prior abuse and the risk of future abuse to the child at issue." *Id.*

**¶18**          The superior court was thorough in describing the evidence and in making findings regarding the credibility of the witnesses and the weight to be given to their testimony.  The court found Parents both abused and neglected their children by allowing Rico, a person they had not properly vetted, to supervise and care for the children.  Parents left the

children in Rico's care for extended periods of time, and, after considering the evidence pertaining to the investigation into the death of K.S., the court found Rico caused her death. As the superior court found, Parents' refusal to assist in the investigation of K.S.'s fatal injuries demonstrated their complicity in the death of their daughter. Both Parents failed to acknowledge the physical evidence of their child's injuries and continued to deny she died of intentionally inflicted physical abuse.

¶19 The superior court also heard that the children had given multiple accounts of abuse or neglect by Mother and Father against them; the children also made statements to third parties about "the fact they told [M]other and [F]ather about the abuse and neglect they were suffering from and observing in the residence." The court found Parents not only knew of the abuse and neglect the children suffered at the hands of Rico, but they also ignored the children's complaints and contributed to that abuse and neglect by the deplorable living conditions they provided for the children.

¶20 Further, Parents' own relationship had an aspect of domestic violence that took place in the presence of the children. And although Mother testified she told Rico to stop biting the children and Father denied knowing of any physical abuse, Parents both refused to acknowledge to authorities the deplorable living conditions of their home or that they had subjected the children to neglect by withholding use of a bathroom and restricting their movement within the home. Although Parents denied these acts, the court specifically found their denials not credible.

¶21 As far as the required relationship between the proven past acts of abuse and neglect and current risk to the children, substantial evidence supports the superior court's findings that Parents "knew or reasonably should have known" Rico was causing the children serious physical or emotional injury, that "Mother and [F]ather continue to be unable to discharge their parental responsibilities currently, as to these children," and "they cannot currently parent their children safely as they are unable to demonstrate or exercise any protective capacity that would provide certainty that these kinds of events would not happen in the future."

¶22 Because we accept the superior court's findings of fact unless they are clearly erroneous, we hold the court did not err by severing Mother's and Father's parental rights under § 8-533(B)(2). *See Maricopa County Juv. Action No. JS-501568*, 177 Ariz. 571, 576 (App. 1994). Accordingly, we need not address Mother's or Father's arguments

disputing the other statutory grounds for severance. *Jesus M. v. Ariz. Dep't of Econ. Sec.*, 203 Ariz. 278, 280, ¶ 3 (App. 2002).

## C.  Best Interests.

**¶23**      The Parents and four of the children argue on appeal that the superior court erred by finding that DCS proved severance was in the children's best interests. Once the court has found a statutory ground exists for termination of the parent-child relationship, it must then determine, by a preponderance of the evidence, whether termination is in the best interests of the children. A.R.S. § 8-533(B); *Mario G. v. Ariz. Dep't of Econ. Sec.*, 227 Ariz. 282, 284-85, ¶ 11 (App. 2011). A best-interests determination can be based upon evidence that the child will benefit from termination of the relationship or, alternatively, that the child would be harmed by continuing the relationship. *James S. v. Ariz. Dep't of Econ. Sec.* 193 Ariz. 351, 356, ¶ 18 (App. 1998). In addition, the court may consider whether (1) an adoptive placement is immediately available, (2) the existing placement is meeting the needs of the child, and (3) the child is adoptable. *Raymond F. v. Ariz. Dep't of Econ. Sec.*, 224 Ariz. 373, 379, ¶ 30 (App. 2010).

**¶24**      Parents and the children contend they all love one another and that the children want to be returned to Parents. Nevertheless, the superior court found severance was in the best interests of the children because "Parents constitute an ongoing risk of abuse and neglect to their children and . . . each of the children are in adoptive placements or are adoptable." Termination of the parent-child relationship would allow a plan of adoption to go forward, providing permanency and stability. The record supports the court's finding: The children are in licensed foster homes and prospective adoptive placements have been identified. While some of the children have special needs, they all are adoptable. Accordingly, the superior court did not err by finding that severance was in the children's best interests.

**CONCLUSION**

**¶25** For the foregoing reasons, we affirm the superior court's order severing Mother's and Father's parental rights.



AMY M. WOOD • Clerk of the Court
FILED:   AA